158 N.J. Super. 285 (1978)
385 A.2d 1266
MURIEL ESPOSITO, PLAINTIFF-APPELLANT,
v.
DANIEL JOSEPH ESPOSITO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 1978.
Decided March 20, 1978.
*289 Before Judges HALPERN, LARNER and KING.
Mr. James C. Orr argued the cause for appellant (Messrs. Lum, Biunno & Tompkins, attorneys; Ms. Claire T. Barile on the brief).
Mr. Everett M. Scherer argued the cause for respondent (Messrs. Riker, Danzig, Scherer & Debevoise, attorneys).
The opinion of the court was delivered by LARNER, J.A.D.
In this matrimonial action the wife appeals from the order of equitable distribution and the alimony award.
The parties were married in 1942 and had three children, all of whom were over 21 and emancipated as of the time of decision below. The marriage was apparently a harmonious one until their separation in 1969. Plaintiff filed her complaint for divorce in late 1971 alleging desertion, and defendant filed a counterclaim based on 18 months' separation. The trial judge granted each litigant a divorce on the respective grounds asserted by them in a judgment dated December 5, 1972. Issues of equitable distribution and support were reserved and ultimately were heard in a series of hearings between January and October of 1975. The court's decision was rendered in a letter opinion dated March 25, 1976, wherein the marital assets were distributed by allocating to the wife a new automobile and two parcels of real estate consisting of the marital home in Livingston and a summer home in Point Pleasant, and awarding all other assets to the husband. The judgment additionally provided for a weekly alimony of $275.
Plaintiff attacks the propriety of the equitable distribution order on two grounds: (1) the judge erred in arriving *290 at the valuation of some of the assets, and (2) the division of the same was disproportionate and inequitable. There is no dispute on appeal as to the assets which are eligible for distribution. She also contends that the alimony award is inadequate.

I
In the presentation of the valuation of the marital assets the parties indicated their accord on the value of the following items, based upon an agreed valuation date for all eligible property as of March 31, 1975:

Asset Value
Cash $ 10,024
Marketable securities 145,000
Life insurance policies (cash value) 7,353
Precision Planning, Inc. - 0 -
Livingston residence (net) 112,658
Point Pleasant residence (clear) 62,000
Florida condominium (net) 16,500
Defendant's pension 8,000
Less: Accounts payable (4,500)
 _________
 Net total of undisputed items $357,035

The items whose valuation was in dispute involve the following:
Mutual funds
Limited partnership interests in real estate
Defendant's interest in automobile dealership known as Dan Esposito Olds, Inc.
Real estate holdings designated as Nassau Central Corp., Nassau Rose Holding Corp. and 355 Central Avenue, East Orange
Stock interest in Airmet, Inc.
The trial judge's finding on the valuation of these disputed items is limited to a mere statement: "I adopt as my fact findings * * * the values as set forth in defendant's memorandum on pages 8 through 20 * * *." This was a written summation submitted by counsel for defendant after the completion of the hearings.
*291 It is noteworthy that there is no articulation by way of factual preference or analysis to support the carte blanche acceptance of defendant's contentions as to values. It is no more nor less than the purported findings in the case of Nochenson v. Nochenson, 148 N.J. Super. 448, 450 (App. Div. 1977), where the judge simply stated that he was in "agreement with the defendant's summation of the evidence submitted at the trial." As we noted in that opinion, such a finding is not an adequate finding of fact which can stand judicial scrutiny on appeal. See also, Benjamin Moore & Co. v. Newark, 133 N.J. Super. 427 (App. Div. 1975).
In a complex financial case of this type it is particularly important that the judge make specific findings so that the parties and the appellate court may be informed of the rationale underlying his conclusion. Because of the absence of adequate articulation the following questions come to mind. Why did the judge accept each of the valuations advanced by defendant? Why were they more reliable evidentially than those submitted by plaintiff? What were the elements in the evidence which led to such a wholesale acceptance of the argument of one side of the controversy versus the other side? And furthermore, which of defendant's values did the judge accept as to those items where defendant vacillated between differing proposed valuations? The conclusory reliance upon a party's argumentative position relating to a series of disputed valuations of several different property interests renders the judge's findings in this respect valueless. As a consequence, we cannot and will not apply the normal standard of review which limits us to the determination whether there is sufficient credible evidence in the record to support the trial court's finding. See State v. Johnson, 42 N.J. 146, 162 (1964). Accord, Close v. Kordulak Bros., 44 N.J. 589, 598-599 (1965). See also, Benjamin Moore & Co. v. Newark, supra.
Normally, the nature of these findings would require a remand to the trial judge to make meaningful findings of fact. However, since the judge who decided the case is now *292 retired, we do not deem it appropriate or fair to the litigants to remand the case for a retrial by another judge, which would entail a tremendous expenditure of time and money for both parties. We therefore invoke our original jurisdiction under R. 2:10-5 and proceed to determine the merits of the controversy on the existing record.
All of the assets were acquired during marriage and did not arise through gift or inheritance. As a consequence there is no issue as to the nature of the assets subject to distribution and, as already noted, there is no dispute as to the valuation of some of the items. We shall therefore limit our factual determination of value to the disputed items and apply the valuation date of March 31, 1975, as accepted by the parties and the trial judge.

Mutual Funds
Defendant proposed and the judge accepted a value for the mutual funds held by defendant of $24,429, which concededly was the quoted value as of August 31, 1974. This was manifestly erroneous in view of the stipulated valuation date of March 31, 1975. As of that date the values computed by plaintiff's accountant from mesne figures between bid and asked prices obtained from brokers amounted to $35,572. We find that the proper valuation of this item is $35,572.

Limited partnership interests in real estate
Defendant had interests in 12 limited partnerships in which he invested a total of $68,150. The book value as of the end of 1974 totalled $30,740  the figure suggested by defendant and accepted by the judge. The only evidence countervailing this valuation was that presented by plaintiff's accountant, who arrived at a total of $102,003 by using assessed valuations and a personal appraisal of the real estate. In view of the absence of competent expert testimony as to values, we find no basis for reliance upon the accountant's *293 opinion in this connection. It is also apparent from the record that some of these properties fail to produce income and require replenishment of capital to maintain them. Under the circumstances reflected by the record, we are impelled to accept the book value of these interests as a fair valuation  namely, $30,740.

Dan Esposito Olds, Inc.
The determinations of the value of defendant's interest in the corporate enterprise known as Dan Esposito Olds, Inc., involves a two-step process: (1) the quantum of his true beneficial stock holdings and (2) the valuation of said interest.
The company is engaged in the sale of new and used cars under a General Motors dealership, with its place of business located on Central Avenue, East Orange. Prior to 1970 defendant was the owner of virtually all of the stock of the company. He asserts that he transferred in that year a 25% stock interest to a nephew who was employed in the business. The record is clear that this transfer, if made, was made without consideration and in order to satisfy a General Motors regulation relating to multiple dealerships which were contemplated by defendant at the time. However, except for the communication of the alleged transfer to General Motors, no stock certificate was ever issued, nor was documentary evidence of any kind presented which would establish the actual transfer. It is also significant that in answers to interrogatories, defendant admitted ownership of all the stock of the corporation except for two qualifying shares allocated to his wife and father. And neither the contemporaneous corporate records nor the corporate tax returns reflected any beneficial interest in anyone other than defendant himself.
Defendant's allegation as to his nephew's stock ownership is further muddied by the fact that defendant testified that he expected payment for the stock at some time, while the nephew testified that it was a gift.
*294 In the face of the foregoing evidential record, the trial judge found that the nephew owned a 25% interest in the corporation and that defendant owned 75% thereof. We are satisfied that this conclusion is contrary to the weight of the evidence and that it clearly and convincingly appears to be a miscarriage of justice. Our careful review of the record convinces us that defendant was and is the beneficial owner of all of the stock of Dan Esposito Olds, Inc.
We next turn to the valuation of this corporate stock interest. As we have observed, the judge accepted all valuations submitted by defendant, which in this instance reflected a figure of $172,104 for the total equity interest, derived from the corporate balance sheet attached to the 1974 federal income tax return. The result reflected by this return did not contemplate the corporate financial status as of March 31, 1975, while the record contains a financial statement submitted by the corporation to General Motors reflecting its financial status as of that date, with a net worth of $233,000. Since we note that the record also contains a General Motors statement as of December 31, 1974 which was almost identical to the federal income tax return as of that same date, it is apparent that the General Motors statement as of March 31, 1975 is a fair and reliable representation of the company's position at that date. We therefore find that the interest of defendant in his business corporation had a value of $233,000 as of March 31, 1975.

Nassau Central Corp., Nassau Rose Holding Corp. and 355 Central Avenue
These three entities encompass the real estate on Central Avenue and Nassau Street utilized in the operation of the automobile dealership, together with a parcel in Springfield, New Jersey occupied as a residence by defendant. Defendant presented a total net valuation of these assets based mainly on book value amounting to $173,372. Plaintiff, on the other hand, offered in evidence an appraisal by a real estate expert retained by defendant and dated September 27, 1974.
*295 The trial judge made no mention of this appraisal and the substantial discrepancy between the estimate of value by defendant's real estate expert and the book value figure utilized by defendant in his argumentative summation. The court simply accepted defendant's proposed figure of $173,372.
It is apparent to us that an appraisal made by a qualified and recognized expert hired by defendant has a much greater evidential impact on true value than a mere book value computed on cost less depreciation. For obvious reasons defendant did not offer this appraisal in evidence, while plaintiff accepted its reliability as an item of evidence created by defendant's agent in the preparation of the case prior to trial.
The appraisal, consisting of 78 pages in the record, constitutes a complete and comprehensive analysis of all the real estate owned by the parties. The values as to the residences were accepted and agreed upon by both litigants. The point of departure arises, however, with respect to the values of the business properties.
The appraiser arrived at a gross figure of $450,000 for the value of the complex of lands and buildings making up the real estate utilized in the business operation on Central Avenue and Nassau Street in East Orange. This was the bottom line result as of August 31, 1974, after a rather extensive investigation of comparable sales in the area as well as an analysis based upon the recognized income and cost approaches.
Although we are impressed by the thoroughness of the expert's appraisal, there are several factors noted therein which require us as factfinders to discount the final figure and arrive at a value which is more consonant with the particular problems applicable to the property involved.
Initially we note that the real estate is located in the core of the City of East Orange which has suffered a tremendous loss of business enterprises and an accompanying loss in property values and available market for their purchase. As *296 pointed out in the appraisal, the "subject neighborhood is considered to be on a precarious brink between complete ultimate blight or overall rehabilitation and survival. In large part, survival is dependent upon governmental agencies and financial institutions outside of the neighborhood committing their resources to the reclamation of the urban cities. * * * Change is not imminent and it can be anticipated that this centralized static period would be maintained into the immediately foreseeable future." Nevertheless, the appraiser proceeded to state that "[t]he sheer quantity of people has placed a premium upon all real estate in the city."
What is perhaps more significant is the concession in the appraisal that the estimate of value presupposes the continued use of the property as a viable and successful automobile agency. In fact, the appraiser specifically points out that "if the business and/or management were to cease, so as to require that the property be disposed of for alternate use * * *," the buildings would have a value defined as the salvage value to offset the cost of demolition and clearing the land for redevelopment. In such an eventuality the market value of the property would not exceed the land value, namely, $292,000. Furthermore, the assessed valuation of the involved properties is $348,600.
It is of interest to note that the income approach of value is not computed upon actual rental income, for the rental established between the business entity and the real estate companies was artificially created to cover the necessary costs and carrying charges of the real estate. Under such circumstances the valuation based upon an anticipated gross income computed on a square-foot rental value has little significance on the issue of realistic evaluation for the purpose of determining immediate equitable distribution.
After a consideration of the appraisal and the foregoing factors relating to the location of the properties, the age of the buildings, their single special use and value, and the absence of a viable market because of such special use, we *297 conclude as factfinders, for the purposes of this litigation, that the total fair valuation of the business lands and buildings on Central Avenue and Nassau Street, East Orange, whether held individually by defendant or in corporate entities controlled by him, should be set at the gross figure of $300,000. This figure must be adjusted to reflect certain corporate liabilities and current assets connected with the properties, which amount to a net deduction of approximately $88,000. We therefore arrive at a net valuation of these business properties in the sum of $212,000.
We should also note that included in the holdings of Nassau Rose Holding Corp. is the Springfield residence, the value of which is not included in the foregoing evaluation of the business properties. This additional asset owned by defendant's company was appraised at $52,000, which value is not contested by either party. Thus, this additional sum of $52,000 must be added to the total of marital assets available for distribution.

Airmet, Inc.
Defendant owned a 50% interest in a corporation known as Airmet, Inc. In June 1975 he sold his stock for the sum of $55,000, payable by $15,000 in cash and $10,000 a year for four years. Defendant proposed a value of $34,840, which represented the book value of his interest as of December 31, 1974; and the trial judge also accepted this valuation without further discussion.
It hardly requires profound analysis to arrive at the conclusion that the actual sales figure is a more realistic evaluation than mere book value. And although the sale was consummated three months after the valuation date of March 31, 1975, the time is close enough for our practical use in the endeavor to arrive at a fair figure.
Defendant urges that the feature of the installment payments of the balance of the purchase price over a four-year period should bar the use of the total price as the fair valuation of this asset. We agree. We have therefore computed the value *298 based upon the extended payout, and applying an 8% interest factor have arrived at the commuted present value as of the time of sale (or March 31, 1975) of $48,121.
A recapitulation of the value of the marital assets which were not included in the list of undisputed items set forth earlier in this opinion follows:

Mutual funds $ 35,572
Limited partnership interests 30,740
Dan Esposito Olds, Inc. 233,000
Business real estate in names of
 Nassau Central Corp.,
 Nassau Rose Holding Corp.
 and defendant, individually 212,000
Springfield property 52,000
Airmet, Inc. 48,121
 _________
 Total 611,433
Added to this total are the
undisputed items listed above 357,035
 _________
 Total eligible marital assets $968,468

II
Our next problem is to determine how the allocation between husband and wife can be made most equitably within the criteria set forth in the cases of Painter v. Painter, 65 N.J. 196 (1974), and Rothman v. Rothman, 65 N.J. 219 (1974).
Plaintiff owns no assets of her own. She is not employed, apparently has not been employed for most of the period of the marriage and has no independent income or earning capacity. She was 58 years of age at the time of the judgment and, as far as the record reveals, the marriage was a harmonious one for a period of approximately 27 years until the parties separated in 1969. During this period of time plaintiff acted as a homemaker, contributing to defendant's needs and the family development by running the household and bringing up three children. Although the business grew and prospered because of the efforts of defendant, nevertheless *299 this business success with the accompanying accumulation of substantial assets was in part the product of the activities of the wife as well as those of the husband as the titular breadwinner. While they lived together their standard of living reflected a substantial income, with a fine suburban home, a summer home at the shore, a condominium in Florida, a boat, three or four automobiles in the family, charge accounts, credit cards and other trappings of an upper middle-class family.
As observed by the Supreme Court in Rothman v. Rothman, supra:
In the second place the enactment seeks to right what many have felt to be a grave wrong. It gives recognition to the essential supportive role played by the wife in the home, acknowledging that as homemaker, wife and mother she should clearly be entitled to a share of family assets accumulated during the marriage. Thus the division of property upon divorce is responsive to the concept that marriage is a shared enterprise, a joint undertaking, that in many ways it is akin to a partnership. Only if it is clearly understood that far more than economic factors are involved, will the resulting distribution be equitable within the true intent and meaning of the statute. See generally, Freed and Foster, Economic Effects of Divorce, 7 Family Law Quart. 275 (1973). [65 N.J. at 229]
See also, Scherzer v. Scherzer, 136 N.J. Super. 397, 401 (App. Div. 1975).
In considering all the relevant factors revealed by the record and the established criteria applicable to the concept of equitable distribution, we are of the opinion that plaintiff should be awarded 30% of the marital assets as the measure of her fair and equitable share thereof. This would result in an allocation to her of the rounded-out sum of $290,000.
The trial judge determined that plaintiff's share of the marital assets should be satisfied by the transfer of defendant's interest in the marital home in Livingston and the summer home in Point Pleasant, free and clear except for the outstanding mortgage on the Livingston property. In addition, he directed defendant to provide plaintiff with a *300 new automobile having a value of $7,000. Based upon the undisputed valuations of the interests in the real estate, this distribution amounted to a total value of approximately $182,000. In light of the absence of proper findings below and our foregoing valuation and allocation of the marital assets, we conclude that the distribution under the order of the trial court is woefully inadequate and not supportable by the evidence in the record.
Since the distribution mandated by the order has already been implemented, defendant is entitled to credit in the sum of $182,000, thereby leaving a balance due from defendant to plaintiff under the terms of this opinion in the sum of $108,000.

III
Plaintiff urges that the alimony award of $275 a week is inadequate. If we were to consider this portion of the judgment in isolation, plaintiff's contention would have substantial merit. However, support payments are intimately related to equitable distribution and the financial security and potential income available because of said distribution. See Smith v. Smith, 72 N.J. 350, 360 (1977); Painter v. Painter, supra, 65 N.J. at 218; Rothman v. Rothman, supra, 65 N.J. at 234.
Our determination of the issue of equitable distribution will result in a substantial capital fund which plaintiff will be able to invest in order to produce additional income. The sale of the Livingston home, as contemplated by plaintiff, should have resulted in a net fund of approximately $112,000 before taxes. The additional distribution of $108,000 under our order will therefore create a total available cash fund of $220,000. If this sum is invested conservatively in prime corporate bonds at a current available return of 8%, it would yield $17,600. If this income of $17,600 is added to the support order for annual payments of $14,200, plaintiff would receive $31,800 a year, without invasion of capital and subject only to income taxes.
*301 It is our considered opinion that this financial picture is one which is consonant with the evidence in the case relating to plaintiff's needs and defendant's income. It represents a fair and equitable resolution of the support feature of this litigation. We will therefore not disturb the alimony award granted by the trial court.

IV
In his appellate brief defendant, citing Tassie v. Tassie, 140 N.J. Super. 517 (App. Div. 1976), urges that the appeal be dismissed because the provisions of the judgment below have been implemented by him and plaintiff has accepted the benefits thereof. Apparently this was accomplished sometime after the filing of the notice of appeal, without application by either party for a stay of the lower court's judgment.
In Tassie this court dismissed the appeal on the ground that appellant was equitably estopped because her actions under the particular facts therein reflected a voluntary acceptance of all the benefits of the judgment and barred her from prosecuting the appeal. In addition, it is noteworthy that the court in that case found no basis for reversal on the factual merits of the case, thereby watering down the precedential effect of the holding dismissing the appeal.
In any event, we are not convinced that plaintiff's actions herein warrant the application of the doctrine of equitable estoppel so as to mandate a dismissal of the appeal. See Simon v. Simon, 148 N.J. Super. 40, 42 (App. Div. 1977). Appellant did not repudiate the judgment below, nor is her appeal materially inconsistent therewith. Her appellate position was limited to an effort to modify upwards the monetary awards of equitable distribution and alimony; and our determination vindicates that position. Her acceptance of the partial benefits in her financial position cannot serve as a legal bar to her right to appeal. Defendant's argument is without merit.

*302 Conclusion

In view of the foregoing, we modify the judgment for equitable distribution so as to direct defendant to pay to plaintiff an additional sum of $108,000. Except for this modification, the judgment below is affirmed in all respects.[1]
NOTES
[1] We have not discussed other items contained in the judgment for equitable distribution because they were not raised as appellate issues by either party. These include: distribution of furnishings in the marital home and in the condominium in Florida, provision for payment of capital gains taxes, return of used automobile by plaintiff to defendant, etc.